COLMAN et al. v. HATHAWAY et al. (two cases).

(District Court, D. Massachusetts. November 17, 1922.)

Nos. 920, 921.

1. Patents ⬤➡114—Suit in equity to obtain patent may be maintained though rights of parties have vested in corporation.

A suit by an applicant, under Rev. St. § 4915 (Comp. St. § 9460), to obtain issuance of a patent to him for an invention for which patent has been issued to another, may be maintained, though the rights of both parties have become vested in the same corporation.

2. Patents ⬤➡90(2)—Inventor who suppresses invention estopped as against subsequent independent inventor.

An inventor who perfects and reduces to practice a useful invention, but fails within a reasonable time to give it to the public, is estopped to assert any right to it as against a subsequent independent inventor of the same thing who makes it public by timely application for a patent.

3. Patents ⬤➡114—Suit to obtain patent independent proceeding.

A suit in equity under Rev. St. § 4915 (Comp. St. § 9460), to obtain a patent is a new and independent proceeding to be determined on the evidence taken therein, and not alone on that before the Patent Office.

4. Patents ⬤➡90(3)—Inventor held estopped by suppression of his invention to assert right to patent as against subsequent inventor.

Defendant invented a warp-tying machine and built one machine which was operated in presence of a few, but there was no public exhibition and no attempt to make commercial use of it, nor further to perfect it until more than three years later and after defendant saw a similar machine of complainant's in operation, though he knew that complainant was working in the same field of invention. Defendant applied for a patent more than four years after his machine was built, and nearly two years after complainant's application was filed. Held that, as against complainant, he was estopped to claim prior right to a patent.

5. Patents ⬤➡328—Unsuccessful applicant held entitled to patent granted to another.

Howard D. Colman held entitled to patent for a warp-tying machine covered by patent No. 1,305,706, issued to Hathaway.

In Equity. Suits by Howard D. Colman and others against Edgar F. Hathaway and others. Decrees for complainants.

Van Everen, Fish & Hildreth and W. Orision Underwood, all of Boston, Mass., and Lincoln B. Smith, of Chicago, Ill., for plaintiffs.

William D. Turner and Charles D. Lanning, both of Boston, Mass., for all defendants.

Thomas B. Booth and Frederick L. Emery, both of Boston, Mass., for defendants American Warp Drawing Machine Co. and Edgar F. Hathaway.

ANDERSON, Circuit Judge. These two bills in equity, brought under R. S. § 4915 (Comp. St. § 9460), to secure the issue of a patent to Colman on a warp-tying machine, were consolidated and heard together before a master, whose conclusion was in favor of Hathaway as the first and original inventor. Colman's exceptions to the report challenge only the soundness of that conclusion, on the facts found.

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

No findings of fact, as distinguished from conclusions therefrom, are attacked. No evidence is reported.

In bare outline, the case is this: Colman made his invention in November, 1903; completed his first machine in January, 1904; his second machine in March or April, 1904; applied for a patent on May 19, 1904, and, beginning in the same year, extensively commercialized the invention; so that by 1914 over 700 of his machines had been sold.

Hathaway had made essentially the same invention and reduced it to practice in October, 1901. He built one machine only, which he never put upon the market or otherwise commercialized his invention. He made no application for a patent until February, 1906, more than 4⅓ years after he completed his invention, and more than a year after, and because, he had seen a Colman machine in operation in a mill.

In 1911 Colman's application was put in interference in the Patent Office in order to determine priority of invention. The interference proceedings resulted, after conflicting decisions by the successive appellate tribunals, in an award of priority to Hathaway by the Court of Appeals for the District of Columbia on February 3, 1919, and the issuance to him of a patent, No. 1,305,706, dated June 3, 1919. The original bills in the present suits were filed on March 11, 1919.

No. 921 may be briefly disposed of. It is based upon the refusal of the Patent Office to issue to Colman a patent covering the broad claims contained in the Field & Lanning patent, No. 1,305,705, for a warp-twisting machine. The master finds as a fact that this patent disclosed a useless and inoperative mechanism. But he also holds that Colman is not entitled to a decree as prayed for in No. 921, because the claims in controversy in No. 921 are also embodied in the warp-tying machines of both Hathaway and Colman, and because he holds that Hathaway is, as noted above, the first and original inventor of the warp-tying device. As this patent, No. 1,305,705, is void as to the claims now in controversy, it follows that Colman, if entitled to a decree in No. 920, is also entitled to a decree in No. 921; otherwise both bills must be dismissed.

[1] While not raised by the exceptions, a preliminary question as to the present right of the plaintiffs to maintain this litigation calls for brief comment. To the original bills answers were duly filed. The proceedings were then strictly adverse. At that time strongly contested patent infringement litigation was pending between the parties. But in the summer of 1919 an agreement of settlement, apparently of all outstanding controversies, was made, under which the Hathaway interests and rights were transferred to the plaintiff Barber-Colman Company, holding the Colman interests and rights. Most of the details as to the settlement and as to subsequent pleadings are not now material. But the agreement of settlement provided:

"It is mutually agreed between the parties hereto that if Howard D. Colman or Barber-Colman Company should desire to further prosecute the said pending proceedings under Revised Statutes of the United States, § 4915, or to institute further proceedings under that section, to procure a patent on Howard D. Colman's warp-tying machine, and the Commissioner of

Patents should appear in said proceedings or should be notified to so appear, the said machine company, Field, Lanning, and Hathaway shall have the full right to furnish all information and render all aid which the Commissioner of Patents might desire or request to enable him to properly defend such proceedings and to establish the priority of invention on behalf of Field, Lanning, or Hathaway therein."

The facts as to this settlement are fully disclosed in the record. There is not the slightest tinge of fraud or concealment. Nevertheless we have the anomalous situation that the plaintiff is, so to speak, now suing himself. Every reasonable and proper effort was made by plaintiff's counsel to cause the Commissioner of Patents to appear in behalf of any public interest that may be thought involved. The Commissioner has declined so to appear. I do not intimate that it was his duty to appear, but his assistance in working out the problem would have been welcome. The master has ruled, and I think, correctly, that notwithstanding the common ownership by the Barber-Colman Company of both the Colman and the Hathaway patents and rights, the plaintiff is entitled to prosecute these proceedings to a conclusion for a final judicial determination as to who was the first and original inventor of an invention concededly representing a great and valuable advance in the art. In this respect the case seems to be on all fours with the situation disclosed in Appert v. Brownsville Plate Glass Co. (C. C.) 144 Fed. 115. See, also, Schmertz Wire-Glass Co. v. Pittsburgh Plate Glass Co. (C..C.) 168 Fed. 73, 87, and cases cited; Highland Glass Co. v. Schmertz Wire Glass Co. 178 Fed. 944, 102 C. C. A. 316; Schmertz Wire Glass Co. v. Western Glass Co. (C. C.) 178 Fed. 973; Western Glass Co. v. Schmertz Wire Glass Co., 185 Fed. 788, 109 C. C. A. 1.

It also happens in this case, as in the Appert Case, that by these proceedings under section 4915 it is sought to require the Commissioner to do what he would have done if not prevented by the action of the Court of Appeals for the District of Columbia, viz. issue a patent to Colman as the original and first inventor. Compare 168 Fed. 87, 88.

It may not be enough to protect the real inventor that the plaintiff corporation now owns the respective rights of both Colman and Hathaway. A patent issued to the wrong party would not avail against infringers. The statute (section 4915) expressly contemplates that in such proceedings there may be "no opposing party."

In the light of these authorities, this court cannot hold itself at liberty, sua sponte, to decline jurisdiction. Obviously it would have been far more satisfactory, particularly on a question so close as to evoke the conflicting decisions disclosed in the history of this prolonged litigation, to have the controversial questions presented by parties representing really adverse interests. The examiner found, May 11, 1916, that Hathaway had not reduced his invention to practice, and awarded priority to Colman. On appeal the Board of Examiners in Chief found, March 12, 1917, that the machine had been reduced to practice and had not been concealed or abandoned, concluding in favor of Hathaway. On the next appeal the Commissioner held, December 1, 1917 (125 M. S. Dec. 73), that the machine had been re-

duced to practice, but that the invention had been concealed and suppressed, and awarded priority to Colman. In the Court of Appeals for the District of Columbia the decision on February 3, 1919 (48 App. D. C. 369), was for Hathaway; that learned court holding, as had two previous tribunals, that the machine had been reduced to practice, and also holding, as the Examiners in Chief held, that it had not been concealed or abandoned

In spite of the settlement, and of the fact that the plaintiff corporation is bearing the entire expense of the litigation, the momentum of the old conflict and the professional interest in the questions involved have enabled learned counsel to present their adverse views with much vigor and acumen.

[2] Turning now to the consideration of No. 920, two questions are involved:

(1) A question of law: Does the statute permit the issuance of a patent to Colman, the first to apply, but not the first to invent? The plaintiff does not contend that Hathaway, the first inventor, abandoned his invention. It is agreed that an abandoned invention goes to the public, not to a later inventor. The master has found no abandonment. The gist of the contention made in behalf of the Colman interests is that Hathaway is estopped, because of his inaction, now to contend that he was the first and original inventor within the meaning of the law.

The contrary view is that the statute (R. S. § 4886; Comp. St. § 9430) grounds no possible right to a patent to any person except the inventor of a "new and useful art, machine," etc., "not known or used by others in this country, before his invention," etc.; that, as it is now an undisputed fact that Hathaway made this invention two years before Colman did, Colman cannot be the inventor within the meaning of the law. This, in substance, is the view expressed 72 years ago by Mr. Justice McLean in his dissenting opinion in Gayler v. Wilder, 10 How. 499, 13 L. Ed. 504, but rejected by a majority of the court. See 10 How. 496, 497, 13 L. Ed. 504. Such construction excludes the doctrine of estoppel by suppression and concealment, as between independent, original inventors. On this theory an original inventor, not literally first in time, has no right to a patent; and the first inventor owes no duty whatever to others working on the same problem.

(2) If the law be ruled in favor of the doctrine of estoppel, then the other question that arises is whether, on the facts found and reasonable inferences therefrom, Hathaway is estopped from claiming to be the first and original inventor as against Colman. This is, apparently, a mixed question of law and fact.

First, as to the law:

Mason v. Hepburn, 13 App. D. C. 86, is generally cited as the leading case in support of the doctrine which must be sustained in order to hold that Colman may, on any theory of the facts found by the master, be entitled to a patent. This was a decision made in 1898, affirming a decision of the Commissioner of Patents in an interference proceeding awarding a patent to Hepburn for an invention made in

April, 1887. The court (page 94), quoting from the opinion in Kendall v. Windsor, 21 How. 322, 327, 16 L. Ed. 165, held that the paramount interest of the public—

"imperatively demands that a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward."

The opinion continues:

"This right of the second discoverer has been recognized with considerable uniformity for a number of years in the administration of the Patent Office. Duncan, Acting Commissioner, in Monce v. Adams, 1 O. G. 1; Paine, Commissioner, in Mallett v. Cogger, 16 O. G. 45, and Farmer v. Brush, 17 O. G. 150; Marble, Commissioner, in Sheridan v. Latus, 25 O. G. 501; and again recently by Commissioner Duell, in whose decision the authorities are extensively reviewed. Mower v. Crisp & Copeland, 83 O. G. 155. It has the sanction also of the following judicial decisions: Rowley v. Mason, 2 Am. Law Times Rep. 106; Consolidated Fruit Jar Co. v. Wright, 12 Blatch. 149; U. S. Rifle and Cartridge Co. v. Whitney Arms Co., 14 Blatch. 94, 101; Boyd v. Cherry, 4 McCreery, 70, 77; Cahoon v. Ring, 1 Cliff. 610; White v. Allen, 2 Fish. 440, 454."

In Curtain Supply Co. v. National Lock Washer Co. (C. C.) 174 Fed. 45, Judge Kohlsaat said:

"It is the settled doctrine of the Court of Appeals for the District of Columbia that when an inventor perfects and reduces to practice an invention, and fails for an unreasonable period to take steps to give it to the public, and until some one else has independently invented and patented it, the earlier inventor forfeits his rights to a patent as against the later inventor."

The same doctrine is asserted in Re Appeal of Mower, 15 App. D. C. 144, 150; Matthes v. Burt, 24 App. D. C. 265. The general principle is also asserted, or at any rate impliedly approved, in Kendall v. Windsor, 21 How. 322, 16 L. Ed. 165; Bates v. Coe, 98 U. S. 31, 46, 25 L. Ed. 68; Gayler v. Wilder, 10 How. 492, 13 L. Ed. 504; U. S. Rifle Co. v. Whitney Arms Co. Fed. Cas. No. 16,793; International Tel. Mfg. Co. v. Kellogg Switchboard & Supply Co., 171 Fed. 651, 96 C. C. A. 395; Bullock Co. v. Jones, Fed. Cas. No. 2,132; Davis & Roesch v. National Steam Specialty Co. (C. C.) 164 Fed. 191; Welsbach Light Co. v. Cohn (C. C.) 181 Feb. 122; White v. Allen, Fed. Cas. No. 17,535; Duncan v. Shelly, 49 App. D. C. 243, 263 Fed. 639. See, also, Robinson, Patents, § 390, and note and cases cited.

No decision is cited in either the Supreme Court or any other federal court—and I find no case—which holds the fundamental doctrine of Mason v. Hepburn to be bad law. In such a state of the authorities, this court would not be warranted in putting so narrow and literal a construction on R. S. § 4886, as to exclude the doctrine of estoppel, made the sole present reliance for the issuance of a patent to Colman. Both on principle and on authority I think the rule laid down in Mason v. Hepburn is sound.

Undoubtedly the owner of a patent may legally suppress it. See the Paper Bag Patent Case, 210 U. S. 405, 422, 28 Sup. Ct. 748, 52

L. Ed. 1122. But obviously a patentee cannot conceal his invention, so as to leave others to waste time, inventive genius, and money in a field already appropriated. A patent puts the invention, however, belatedly, at the public service. Yet suppression of patents—inventions fully disclosed—is a practice which has evoked much public criticism, and strong judicial protest, as so inconsistent with sound public policy as to warrant denying protection in equity to patent rights thus held unused in disregard of the underlying purposes of the patent act.

But, if suppression of patents is bad, suppression of inventions is much worse; it runs directly counter to the public policy of the patent act.

Second, do the facts found and reported by the master ground an estoppel against Hathaway?

[3] At the outset it should be observed that a suit under R. S. § 4915, is a new and independent proceeding. Sutton v. Wentworth, 247 Fed. 493, 500, 160 C. C. A. 3; Greenwood v. Dover, 194 Fed. 91, 114 C. C. A. 169. In the case at bar this is no merely technical distinction; for, in addition to over 2,700 pages of evidence in the record in the Patent Office, which was, apparently by agreement, put in before the master, he considered some 1,300 pages of additional testimony and briefs of 706 pages. His findings of fact are therefore grounded on a record materially different from that considered by the Court of Appeals for the District of Columbia and the other Patent Office tribunals. The conclusion of this court must be based on the facts found by the master, which may be substantially different in import from the evidence before the Patent Office tribunals. The case is not like Gold v. Newton, 254 Fed. 824, 827, 166 C. C. A. 270.

It is also manifest that, for the purpose of determining whether there was estoppel, the facts must be dealt with as though the parties were still in sharp and financially vital conflict. The settlement in 1919 must be disregarded.

[4] Colman and Hathaway were both inventors in the warp-replenishing field, which covers warp-drawing as well as warp-twisting and warp-tying. Colman had invented one warp-drawing machine and applied for a patent on it as early as 1894. Hathaway, with his associates, Field and Lanning, formed the American Warp Drawing Machine Company in 1900 to own and develop the Field, Lanning, and Hathaway inventions. Lanning was a lawyer; Field and Hathaway mechanics and inventors. Lanning determined the patent policy of the company. He knew, before Hathaway had completed his warp-tying machine on October 12, 1901, that Colman had invented a warp-drawing machine, and that it had been operated in the Merrimac Mills; also that Colman had invented a hand knotter which was in use in cotton mills. Lanning knew, and in May, 1903, wrote, that "every attempt to develop a drawing-in machine has been accompanied by an attempt to make a tying-in machine."

In a report made in July, 1903, to Lanning, referring to Mr. Draper, one of the largest mill machinery manufacturers in the country, it was stated:

"Mr. Draper seemed to know nothing of the development of the Barber and Colman drawing-in machine except that he is under the impression that they control some valuable patents; he considers Mr. Colman a very clever man and thinks that, if he confined his attention to this field, there is very little question but that he will be heard from later on."

Apart from presumptions as to other inventors in the same field (compare Robinson, Patents, § 390, note), Hathaway and his associates had fairly specific and detailed knowledge that Colman was struggling with the same problems upon which they were engaged. Under such circumstances, they had no right to assume that they were the only inventors working in that field. In fact, Colman had been meditating a warp-tying machine since August, 1899, and, as the master finds, this machine was also a natural growth from his drawing-in machine and a hand knotter which he had already invented and put on the market. While the master finds that "both Hathaway and Lanning, up to the time they learned of Colman's tying machine, believed there was no rival in the field, and that there was no need to hurry in the matter of applying for a patent; had they suspected Colman's activities, without doubt they would have taken steps to apply for a patent in advance of Colman," this finding, that they believed that there was no rival in the field until they saw Colman's tying machine in January, 1905, must, in the light of the other facts found by the master, be taken to mean only that they did not know of Colman's actual invention of a tying-in machine. Plainly they knew he was working in the warp-replenishing field.

After Hathaway completed his tying-in machine on October 12, 1901, it was tested for four or five weeks in the factory of the American Warp Drawing Machine Company before some of the officials and employees of the company and "a few others." Who these "few others" were does not appear. During the period, November, 1901, to January, 1902, "it was occasionally operated for exhibit to outside visitors, including a number of mill men." But "there was no public exhibition of the machine." This finding of no public exhibition is an important finding. Taken in connection with the other facts reported, this indicates that there was no such disclosure of this machine —characterized as an extremely complicated and extraordinary piece of mechanism—as would have enabled any of the few who saw it, even if so disposed, to steal or imitate the invention. Essentially the showing was "a private view." It is hardly conceivable that the owners would have failed promptly to apply for patent protection if they had not had full confidence that the invention remained, in effect, a secret, particularly when they knew that Colman was at work in the same field.

An important fact in this connection is that Colman was, during this period of more than two years after Hathaway's invention, working on the same problem, reaching in November, 1903, essentially the same solution, neither knowing nor being chargeable with knowledge of Hathaway's prior invention. Hathaway's invention was certainly concealed from Colman. And after Colman had invented his machine, and, with his associates, was rapidly pushing its commercial develop-

ment, presumably at large expense and with the usual risks incident to the introduction of a new device, Hathaway left his machine unimproved and of no use in the art. The master says:

"In October, 1902, Hathaway wrote: 'The tying-in machine, although not much has been done with it for some time, is in shape for practical operation.' On the same date Lanning wrote: 'Have done very little toward pushing it ahead during the past few months.' I cannot find that anything was done with Exhibit 54 in the way of increasing its speed, or ability to handle finer yarns, prior to the filing of the Hathaway application. The machine stood, for the most part of the time, covered up in one of the shops of the machine company. It was occasionally oiled to prevent rust, but nothing else was done to it. While it is true that work was being done towards refining the warp worms in use on the company's drawing-in machines and that any improvement in warp worms could have been made use of on the tying machine, no work was being done on Exhibit 54 itself."

Exhibit 54 is the warp-tying machine covered by patent No. 1,305,706.

In discussing Hathaway's delay until February 14, 1906, in filing his application, the master says:

"An inventor is not to be criticized if he takes a reasonable time to perfect his invention before applying for a patent. In the present instance the inventor had already worked out, as he believed, a complete embodiment of his invention when on October 12, 1901, he wrote: 'T machine all finished excepting flexible shaft attachment. Works well on 28's and also on 60's excepting warp worm wants more refining.' It was not yet perfect from the inventor's standpoint, although it worked well; the warp worm needed refining."

But, if it be assumed that more than four years might, under some circumstances, be a reasonable time to perfect an invention (already reduced to practice) before applying for a patent, the master's finding supra that he could not find that anything was done with the machine "in the way of increasing its speed, or ability to handle finer yarns," effectually disposes of that excuse for delay. Hathaway was neither perfecting his invention, commercializing it, nor in any other way making it of value to mankind. Yet there was then a ready market for a tying machine, and, as noted above, on the facts found by the master, it must be held that Hathaway was chargeable with knowing that Colman was then struggling with the problem.

Colman's performance is a fair test of what reasonable diligence would have done with Hathaway's invention. Colman invented in November, 1903; finished his perfecting experiments by April, 1904; applied for his patent on May 19, 1904, 6 months from invention to full disclosure; and vigorously pushed his patent into general use, over 700 of them in 10 years. Applying this test, Hathaway should have applied for a patent in April 1902, and promptly thereafter commercialized his machine, so that Colman might have devoted his inventive genius to some other unsolved problem. In fact, as early as October 8, 1902, the papers for the proposed Hathaway patent were in preparation. But, as already stated, none were filed until February, 1906.

That Hathaway was "stirred to activity by the knowledge of his rival's successful exploitation of the invention" (see Lederer v. Walker, 39 App. D. C. 122, 125, 126) explicitly appears from the master's finding:

"There is no doubt that, when Hathaway saw the Colman tying machine at the Olympia Mills in January, 1905, he realized that a competitor was in the field and that this led to the filing of the Field & Lanning application and his own application, and that this action would lead to an interference which would hamper or prevent Colman from securing adequate patent protection for his tying machine. Hathaway believed then and still believes that he was the first inventor of a tying machine, and that he alone is entitled to a patent therefor. He then realized that it was incumbent upon him, if he wished to establish his claim, to file his application, and in doing so he acted within his rights."

The master's conclusion that Hathaway "acted within his rights" in filing his application more than a year after he learned of Colman's success in making the same invention is obviously grounded upon the theory that Hathaway owed no duty to other inventors, but owed a duty only to himself to file his application within the two-year period. R. S. § 4886.

Plainly, if Hathaway owed Colman any duty to disclose, he failed to perform that duty. On this record it must be held that Colman relied on Hathaway's non-disclosure to his (Colman's) harm.

Even after, in January, 1905, Hathaway saw Colman's machine in actual operation in a mill, he waited more than a year before filing his application; and it was not until December 12, 1906, that Colman "received his first intimation of probable interference and discovered that the rival applicants were the same people with whom he was in litigation over the warp-drawing machine." Colman at that time had about 80 of his machines in successful operation in various mills. When Hathaway would have filed an application except for the spur of Colman's achievement is purely conjectural. Doubtless he intended at some time to put his invention to practical use. When he would have done so if he had not been stimulated to activity by Colman's invention we can only guess. Lederer v. Walker, 39 App. D. C. 122, 130. But on all the facts it is clear that, from about April, 1902, when in the exercise of reasonable diligence he should have filed his patent papers, and have begun the commercial development of the machine, until February, 1906—over three years—Hathaway's failure to exercise reasonable diligence in disclosing his invention misled Colman and his associates to their harm. Kirk v. Hamilton, 102 U. S. 68, 76, 26 L. Ed. 79. Robinson, Patents, § 390, and note. It is also clear that it was Colman and his associates, not Hathaway and his associates, that made this invention of value to mankind.

One excuse found by the master for Hathaway's delay is that from October 12, 1901, when the invention was completed, to February, 1906, when the application was filed—

"Field, Lanning, and Hathaway were devoting their attention to improving and perfecting their drawing-in machine, and that they postponed any work on the tying machine until such time as they had more fully developed the drawing-in machine. They asked the advice of several New England cotton mill men on the subject of putting out a tying machine and received no encour-

agement, but it was not due to this adverse advice that work on the tying machine was postponed. They believed that any improvement in the drawing-in machine warp worms could be utilized on the tying machine, and, while there is no evidence that any improved warp worm was ever tried out on the tying machine, there is no doubt but that both Hathaway and Lanning expected and intended to put out a tying machine when the warp worms had been so developed on the drawing-in machine as to enable that machine to handle both coarse and fine yarns. The first permanent installation of a drawing-in machine handling yarn as fine as 60's to 80's was not made by the machine company until March, 1905, and the second one not until January, 1906."

I concur with the Commissioner that such conduct is exactly what had been condemned in Mason v. Hepburn and other similar decisions. Compare Lederer v. Walker, 39 App. D. C. 122, 125.

I reach the same conclusion as did the Commissioner, on a record which, judging from his opinion, seems to make less strongly in favor of Colman than did the facts found by the master in this case.

The rule in Morgan v. Daniels, 153 U. S. 120, 125, 14 Sup. Ct. 772, 38 L. Ed. 657, and Greenwood v. Dover, 194 Fed. 91, 114 C. C. A. 169, that Patent Office decisions as to priority are to be set aside only on clear conviction of error, has little or no bearing under the peculiar facts of this case, where the real issue is not one of credibility or weight of evidence as to which inventor was first in time, but is one of equitable estoppel. Compare Gold v. Gold, 237 Fed. 84, 86, 150 C. C. A. 286.

The master's report of only 33 pages is a remarkably clear and brief statement of the controlling facts derived from a record of over 4,000 pages, besides exhibits. His work has received the warm commendation of counsel, including counsel who do not accept his conclusion. But his report indicates that he did not adequately distinguish abandonment, which is a dedication to the public, and equitable estoppel, by nondisclosure or suppression and concealment, which, on the doctrine of Mason v. Hepburn, redounds to the benefit of the later inventor and earlier applicant. Nowhere does he discuss estoppel. But he says:

"Was the more than four years' delay in filing the application for a patent an undue or unreasonable delay? Taking into consideration all the evidence on the subject, I find that the delay was not so unreasonable as to warrant the conclusion that the invention had been abandoned, such abandonment being contrary to the intention and against the wishes of the inventor." (Report, p. 27.)

Again:

"The course adopted by Hathaway and the machine company in reference to the invention shown by Exhibit 54 might lead one to believe that the invention had been abandoned by them, but I find that they had not abandoned it, for they expected to take up the machine again, possibly redesign it, certainly improve it and endeavor to place it on the market." (Report, p. 25.)

And again:

"There is no doubt but that both Hathaway and Lanning expected and intended to put out a tying machine when the warp worms had been so developed on the drawing-in machine as to enable that machine to handle both coarse and fine yarns." (Report, p. 25.)

In Robinson, Patents, § 390, note, this frequent confusion of abandonment and estoppel is thus commented upon:

"This doctrine would probably have long ago met with universal acceptation had it not been unnecessarily confounded with abandonment of the invention to the public which rests upon the actual or presumed intention of the inventor to relinquish his exclusive right to the invention in favor of the community at large. * * *

"The doctrine of estoppel as enforced against a negligent inventor in favor of his rival is thus neither an extension of nor a departure from the principles of patent law, but is a rule of universal application which may as appropriately be resorted to in controversies between the antagonistic claimants of an invention as in those which arise in reference to any other class of property."

So in the opinion of the learned Chief Justice of the Circuit Court of Appeals for the District of Columbia the stress is put, not on estoppel, but on abandonment and the requirement of strict proof of abandonment. Mason v. Hepburn and In re Mower are cited, but said to be inapplicable.

[5] On the record before me, which, as already noted, may be substantially different from the record before the learned court, I cannot concur in the result reached by that learned court. I think and hold that the doctrine of Mason v. Hepburn is exactly applicable to this case, as now presented, and that therefore Hathaway is estopped to claim priority over Colman.

Decrees accordingly.